**R.R. STREET & CO. INC., Petitioner,**

v.

**PILGRIM ENTERPRISES, INC.,
et al., Respondents.**

No. 02–0758.

Supreme Court of Texas.

Argued Jan. 14, 2004.

Decided June 10, 2005.

Brian M. Keller, John B. Thomas and, Laura Rowe, Hicks Thomas & Lilienstern, L.L.P., Houston, Mike A. Hatchell and Molly H. Hatchell, Locke Liddell & Sapp LLP, Austin, for Petitioner.

Jennifer Bruch Hogan and Richard P. Hogan Jr., Hogan & Hogan, L.L.P., Jean C. Frizzell and Laura Hanley Carlock, Gibbs & Burns, L.L.P., David Kent Mestemaker, Gibbs & Burns, Dennis C. Reich, Reich & Binstock, L.L.P., N. Terry Adams and Jeffery T. Nobles, Beirne Maynard & Parsons, L.L.P., Robert E. Morse III, Crain Caton & James, P.C., Michael A. Pohl, Law Offices of Michael A. Pohl, Alice Oliver–Parrott, Barrow & Parrott, L.L.P., Houston, William Powers Jr., The University of Texas School of Law, Austin, for Respondents.

Justice O'NEILL delivered the opinion of the Court.

The owner of several dry-cleaning facilities filed this suit under the Texas Solid Waste Disposal Act ("SWDA") seeking to recover costs that it incurred to remediate environmental contamination. SWDA imposes responsibility for solid waste cleanup costs on persons who "arranged" to dispose of solid waste. In this case of first impression, we must decide the intended scope of "arranger liability" under SWDA, in particular when the alleged arranger was an equipment and chemical supplier who provided waste disposal advice and improperly discarded test-vial waste fluid. We hold that under the circumstances this case presents, the supplier was not an arranger subject to potential liability under SWDA based upon its giving advice regarding waste disposal. We also hold that a fact issue exists as to whether the supplier is potentially liable as an arranger based upon its own disposal of test-vial waste fluid. The court of appeals therefore erred in failing to remand the case for

Nishita S. Shah, Gardere & Wynne, Dallas, amicus curiae Halogenated Solvents Industry.

D. Patrick Long, Patton Boggs LLP, Dallas, amicus curiae International Fabricare Instit.

a new trial on the SWDA cause of action, and we reverse the court of appeals' judgment in part and remand to the trial court for further proceedings consistent with this opinion.

## I. Background[1]

The Robertson family bought Pilgrim Laundry & Cleaners [2] in 1945, and over a span of five decades Pilgrim operated a chain of dry-cleaning facilities in Houston and San Antonio. Pilgrim used perchloroethylene ("PCE") in its dry-cleaning operations, a chemical solvent commonly used in the industry. In 1994, in the course of selling its assets, Pilgrim conducted a mandatory environmental assessment which revealed that the soil and groundwater at sixteen of Pilgrim's twenty facilities were contaminated with PCE. Pilgrim notified the Texas Natural Resources Conservation Commission ("TNRCC" or "the Commission") [3] of the findings and entered into a voluntary cleanup agreement to remediate the sites. The TNRCC approved the remediation and closure plans, and the total cleanup cost to conduct the activities approved under the plans amounted to over $7 million.

Pilgrim purchased PCE and equipment from R.R. Street & Co. Inc., which designed, manufactured, and distributed dry-cleaning equipment and products. For nearly forty years, from 1958 to 1997, Pilgrim's principal contact at Street was Harold Corbin. Corbin had complete access to Pilgrim's facilities, and Pilgrim dealt almost exclusively with him. Among other products, Corbin sold Pilgrim equipment that recycled dirty PCE for reuse. One piece of such equipment, a filter, circulated dirty PCE through cartridge filters, which had to be replaced periodically. Following common industry practice, Pilgrim disposed of the used cartridge filters that had collected PCE by simply discarding them in dumpsters located on the premises. Another piece of equipment Street manufactured and sold to Pilgrim was called a still. Dirty PCE was heated in the bottom of the still until it evaporated and rose to the top along with some water. The soils and unevaporated PCE that remained at the bottom were also discarded by Pilgrim in dumpsters, again pursuant to industry practice at the time. The evaporated PCE was partially separated from the water and reused. Corbin advised Pilgrim to dispose of the remaining PCE-contaminated "separator water" by pouring it down the drain, which Pilgrim did. Corbin also advised Pilgrim to dispose of PCE-contaminated separator water that remained after the clothes-drying process in the same way. In 1985, in accordance with new federal regulations, Pilgrim hired Safety-Kleen, a waste disposal company, to dispose of the PCE waste at proper facilities. In 1991 Pilgrim switched companies and began using AAD for its disposal needs.

On his visits to Pilgrim's facilities, Corbin conducted titration tests to determine the concentration of the plant's detergent. He performed the tests by combining a 1.25-cc sample of PCE, taken from a dry-cleaning machine, with other chemicals.

---

1. We have omitted information about parties in the trial court and court of appeals who did not file a petition for review in this Court and whose claims are not before us.

2. We will refer to Pilgrim Enterprises, Inc., and related entities collectively as "Pilgrim."

3. Effective January 1, 2004, the Legislature changed the Commission's name to the Texas Commission on Environmental Quality. Act of May 28, 2001, 77th Leg., R.S., ch. 965, § 18.01, 2001 Tex. Gen. Laws 1933, 1985. To avoid confusion, we will refer to the Commission by the name it operated under before the change, which is when these proceedings arose.

Corbin used the results of these tests to evaluate the plant's level of success in using PCE efficiently and to make any needed suggestions. When finished with the test vial, Corbin testified that he would dump the approximately 40 cc's of waste fluid down the sink or toilet. According to Corbin, he likely did so on thousands of occasions. There was evidence, albeit disputed, that at least some of the facilities' sewage pipes had leaked, creating a potential source of contamination from the test-vial fluid and separator water. There was also evidence that spills of varying amounts occurred "about every week" at the facilities during PCE deliveries from distributors other than Street.

After Pilgrim discovered the contamination and entered into the voluntary cleanup agreement with the TNRCC, Pilgrim sued Street and several other PCE and PCE-equipment manufacturers and distributors. In addition to its SWDA cost-recovery claim, Pilgrim alleged causes of action for negligence, fraud, products liability, breach of fiduciary duty, and DTPA violations. All defendants but Street settled with Pilgrim before trial, and after Pilgrim presented its evidence at trial, the trial court granted a directed verdict for Street on Pilgrim's breach of fiduciary duty claim. After all the evidence was presented, the trial court refused Street's request to submit jury questions regarding Street's arranger liability under SWDA, deciding the questions as a matter of law in Pilgrim's favor and apportioning $1.5 million of the approximately $7 million cleanup costs to Street. The jury decided Pilgrim's remaining claims in Street's favor, and both parties appealed. The court of appeals affirmed the judgment in Street's favor on the common-law and DTPA claims, and as Pilgrim does not complain of that portion of the judgment in this Court, it is not before us. With regard to the SWDA portion of the judg-ment, the court of appeals is affirmed in part and reversed in part. 81 S.W.3d 276, 306.

The court of appeals held that, while Street was entitled to have a jury resolve fact issues relating to Pilgrim's SWDA claim, *id.* at 287–88, the trial court did not err in failing to submit the SWDA liability issue to the jury because Pilgrim had established Street's liability as a matter of law. Specifically, the court of appeals held: (1) Street, through Corbin, was a "person responsible for solid waste" under SWDA because it had arranged for the disposal of solid waste by instructing Pilgrim to pour separator water into the sewer and by pouring PCE test-vial mixtures down the sinks and toilets at Pilgrim's facilities, *id.* at 295–96; (2) Pilgrim's remedial actions were approved by the TNRCC, *id.* at 299; (3) there was a "release" of a solid waste (PCE) into the environment, *id.*; (4) Pilgrim's remedial costs were reasonable and necessary, *id.* at 299–302; and (5) Pilgrim made reasonable attempts to notify Street of the release and Pilgrim's intent to remedy it. *Id.* at 302–03.

In conjunction with those holdings, the court of appeals rejected Street's argument that the "domestic sewage exclusion" applied to the PCE-mixture Corbin poured into the sewer system. *Id.* at 296–98. In addition, the court of appeals concluded that causation is not an element of liability under SWDA and therefore Pilgrim did not have to prove that Street's actions caused Pilgrim to incur response costs in order to sustain its cause of action; rather, the court of appeals held, causation is a factor for the trial court to consider in apportioning costs after liability is established. *Id.* at 298. Finally, because fact issues remained as to the amount of waste attributable to Street and whether Street's actions were causally related to Pilgrim's remedial activities, the court of appeals

reversed and remanded only that portion of the judgment awarding Pilgrim damages for the jury to make the requisite factual determinations and for the trial court to apportion costs. *Id.* at 304–06.

We granted Street's petition for review to consider whether Street was an "arranger" within SWDA's meaning, and other related issues.

## II. SWDA

### A. Purpose and General Provisions

SWDA, embodied in chapter 361 of the Texas Health and Safety Code, is our state counterpart to two federal environmental statutes: the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992, and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 42 U.S.C. §§ 9601–9675. While RCRA "is designed primarily to regulate on-going treatment, storage, and disposal of solid and hazardous wastes," *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1201 (2d Cir.1992), CERCLA was enacted to facilitate the prompt clean-up of hazardous substances that have already been released into the environment and to ensure that those responsible for the hazardous substances bear the cost of their actions. *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 258 (3d Cir.1992); *see also Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 171 F.3d 1065, 1068 (6th Cir.1999); *OHM*

*Remediation Servs. v. Evans Cooperage Co.,* 116 F.3d 1574, 1578 (5th Cir.1997).

■ The purpose of SWDA, originally enacted in 1969 and codified twenty years later, is "to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste,[4] including accounting for hazardous waste that is generated." Tex. Health & Safety Code § 361.002(a). As the court of appeals noted, SWDA's cost-recovery provisions are structured similarly to those in CERCLA, which the federal courts have given a liberal interpretation consistent with Congress's " 'overwhelmingly remedial' statutory scheme." 81 S.W.3d at 290–91 (quoting *United States v. Aceto Agric. Chems. Corp.,* 872 F.2d 1373, 1380 (8th Cir.1989)); *see, e.g., Murtha,* 958 F.2d at 1198. We in turn will interpret SWDA liberally to give effect to its remedial purpose. *See Burch v. City of San Antonio,* 518 S.W.2d 540, 544 (Tex.1975) ("If a statute is curative or remedial in its nature the rule is generally applied that it be given the most comprehensive and liberal construction possible.").

In accordance with that purpose, SWDA, like CERCLA, provides mechanisms for the clean-up of solid waste and for both governmental entities and private parties to recover clean-up costs from those responsible for the waste.[5] *See, e.g.,* Tex. Health & Safety Code §§ 361.272, .197, .344; 42 U.S.C. §§ 9607, 9613(f). Pil-

---

4. "Solid waste" is defined, with certain exceptions that will be discussed later, as "garbage, rubbish, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining and agricultural operations and from community and institutional activities." Tex. Health & Safety Code § 361.003(34).

5. We note that SWDA subjects those responsible for "solid waste" to liability and that its definition of "solid waste" is similar to that in RCRA. 42 U.S.C. § 6903(27). CERCLA, on the other hand, imposes potential liability on parties who arrange for the disposal or treatment of "hazardous substances," which is defined differently. *Id.* § 9601(14).

grim brought this cost-recovery action under section 361.344 of the Health and Safety Code, which states in pertinent part:

### § 361.344. Cost Recovery by Liable Party or Third Party

(a) A person who conducts a removal or remedial action that is approved by the commission and is necessary to address a release or threatened release may bring suit in a district court to recover the reasonable and necessary costs of that action and other costs as the court, in its discretion, considers reasonable.

. . . .

(c) To recover costs under this section . . . the person seeking cost recovery must have made reasonable attempts to notify the person against whom cost recovery is sought:

(1) of the existence of the release or threatened release; and

(2) that the person seeking cost recovery intended to take steps to eliminate the release or threatened release.

(d) The court shall determine the amount of cost recovery according to the criteria prescribed by Section 361.343.

Tex. Health & Safety Code § 361.344(a), (c), (d). Section 361.343, which will be discussed in more detail later, sets forth the following factors for the court to consider in apportioning remedial costs among those responsible for solid waste:

(1) the relationship between the parties' actions in storing, processing, and disposing of solid waste and the remedy required to eliminate the release or threatened release;

(2) the volume of solid waste each party is responsible for at the solid waste facility or site to the extent that the costs of the remedy are based on the volume of solid waste present;

(3) consideration of toxicity or other waste characteristics if those characteristics affect the cost to eliminate the release or threatened release; and

(4) a party's cooperation with state agencies, its cooperation or noncooperation with the pending efforts to eliminate the release or threatened release, or a party's actions concerning storing, processing, or disposing of solid waste, as well as the degree of care that the party exercised.

*Id.* § 361.343(a). SWDA thus allows even liable parties who have expended remedial costs to apportion those costs among others who are also responsible for solid waste under the Act. CERCLA similarly allows a "potentially responsible person" to bring a contribution action to recover its response costs and provides that the court may allocate those costs "using such equitable factors as the court determines are appropriate."[6] 42 U.S.C. § 9613(f); *New*

---

**6.** In a recent case, the United States Supreme Court held that a party who has voluntarily incurred cleanup costs, and is not subject to suit by a governmental entity to compel cleanup or recover response costs, cannot obtain contribution from other liable parties. *Cooper Indus., Inc. v. Aviall Servs., Inc.,* — U.S. ——, 125 S.Ct. 577, 580, 160 L.Ed.2d 548 (2004). In so holding, the Court focused on the following narrow language in the CERCLA provision providing a right to contribution: " 'Any person *may* seek contribution . . . *during or following* any civil action under section 9606 of this title or under section 9607(a) of this title.' " *Id.* at 583 (quoting 42

U.S.C. § 9613(f)(1) (alteration in original)). The corresponding SWDA enabling provision contains no similar limiting language, providing simply that "[a] person who conducts a removal or remedial action that is approved by the commission and is necessary to address a release or threatened release may bring suit in a district court to recover the reasonable and necessary costs of that action and other costs as the court, in its discretion, considers reasonable." Tex. Health & Safety Code § 361.344(a). There is no reference in SWDA to a required civil action by the government. Thus, the Supreme Court's opinion

*Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1121 (3d Cir.1997).[7]

■ Based on the statutory language quoted above, we agree with the court of appeals' formulation of the elements of a private cost-recovery action under SWDA: (1) the defendant is a "person responsible for solid waste" as defined in section 361.271; (2) the TNRCC approved the plaintiff's removal or remedial action; (3) the action was necessary to address a release or threatened release of solid waste; (4) the costs of the action were reasonable and necessary; and (5) the plaintiff made reasonable attempts to notify the defendant of both the release and the plaintiff's intent to take steps to eliminate the release. Tex. Health & Safety Code § 361.344; 81 S.W.3d at 288. In this Court, Street asserts that the court of appeals erred in holding that the first, third, and fourth elements were established as a matter of law.

## B. Arranger Status

■ The court of appeals held that, barring a dispute as to the underlying facts, whether a defendant is a "person responsible for solid waste" is a question of law. 81 S.W.3d at 288–89. We agree. In reaching its decision, the court of appeals relied on *State Department of Highways & Public Transportation v. Payne,* 838 S.W.2d 235, 238 (Tex.1992), in which we held that whether a condition constitutes a premise defect or a special defect under the Texas Tort Claims Act is a question of law. We reasoned that such a question is one "of duty involving statutory interpretation and thus an issue of law for the court to decide." *Id.* (citing *Blankenship v. County of Galveston,* 775 S.W.2d 439, 441 (Tex.App.-Houston [1st Dist.] 1989, no writ) (noting that questions of statutory interpretation must be decided by the court)). Whether a defendant is a "person responsible for solid waste" is a duty determination that depends upon the construction of SWDA; therefore, barring a dispute regarding the underlying facts, arranger status is a question of law for the court to decide. *See Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 395 (Tex.1991) (jury question about the existence of a duty can arise when the underlying facts necessary to determine duty are in dispute).

The Legislature amended SWDA in 1985 to add the provision now codified as section 361.271 of the Health and Safety Code. Act of May 23, 1985, 69th Leg., R.S., ch. 566, § 9, 1985 Tex. Gen. Laws 2166, 2176 (as amended) (current version at Tex. Health & Safety Code § 361.271). Section 361.271 provides, in pertinent part, that a person is responsible for solid waste if the person

(3) by contract, agreement, or otherwise, arranged to process, store, or dispose of, or arranged with a transporter for transport to process, store, or dispose of, solid waste owned or possessed by the person, by any other person or entity at:

in *Cooper Industries* does not affect suits brought exclusively under SWDA, and Pilgrim's suit is not foreclosed by Pilgrim's voluntary cleanup of its facilities.

**7.** As noted in *Halliburton,* while a CERCLA action brought by the United States to recover its remediation costs can result in a defendant's being held jointly and severally liable for those costs, in a section 9613(f) contribution action brought by one potentially responsible person against another, liability is allocated based on equitable considerations. 111 F.3d at 1120–22 & n. 6. Similarly, a private contribution action under SWDA, like the one in this case, does not implicate joint and several liability.

(A) the solid waste facility owned or operated by another person or entity that contains the solid waste; or

(B) the site to which the solid waste was transported that contains the solid waste[.]

Tex. Health & Safety Code § 361.271(a)(3). In amending SWDA, the Legislature chose language very similar to that of CERCLA, which defines a "covered person" under that Act as

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3).

Texas law is bereft of cases discussing the scope of arranger liability under SWDA, and we look to federal case law for guidance in interpreting the term "otherwise arranged" to dispose of solid waste,[8] which is not defined in either SWDA or CERCLA. *See City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 360 (Tex. 2000) (citing *Blackmon v. Hansen,* 140 Tex. 536, 169 S.W.2d 962, 964–65 (1943)) ("When the Legislature adopts a federal statute, we presume that it knew of the federal court's construction of the federal statute when it adopted the statute and intended to adopt that construction.").

We begin by noting that the federal courts are clear that a transaction to sell a product containing a hazardous substance that is ultimately disposed of does not in itself constitute an arrangement for disposal. *E.g., Carter–Jones Lumber Co. v. Dixie Distrib. Co.,* 166 F.3d 840, 845 (6th Cir.1999); *Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co.,* 142 F.3d 769, 775 (4th Cir.1998); *see also E S Robbins Corp. v. Eastman Chem. Co.,* 912 F.Supp. 1476, 1486–87 (N.D.Ala.1995) (chemical supplier that arranged for transportation of chemicals by common carrier to the buyer did not arrange for their disposal simply because it had knowledge of risk that spills can occur during transportation). A disposal transaction may nevertheless be disguised as a sale, and courts consider factors such as the parties' intent and the usefulness and value of the product when sold in evaluating such a transaction. *Pneumo Abex Corp.,* 142 F.3d at 775. Pilgrim does not argue, and the court of appeals did not find, that Street's mere sale of PCE and equipment to Pilgrim subjected Street to arranger liability. We therefore turn to cases in which the allegations of arranger status are based on conduct other than or in addition to the sale of a hazardous substance.

The parties in this case seem to agree that there is no bright-line rule for determining whether a defendant "otherwise arranged" to dispose of hazardous waste under CERCLA, but here their agreement ends. Street argues that the "common thread uniting the vast majority of CERCLA arranger cases" is that no court has imposed arranger liability on a party who did not have either (1) the authority to dispose of the waste together with actual involvement in its disposal, or (2) the obligation to dispose of the waste. Pilgrim, on the other hand, contends federal case law supports the proposition that actual in-

---

8. There is no relevant, formal contract or agreement between the parties in this case, so our inquiry is limited to whether Street "otherwise[] arranged to process, store, or dispose of or arranged with a transporter for transport to process, store, or dispose of, solid waste." Tex. Health & Safety Code § 361.271(a)(3).

volvement in the decision to dispose of waste is sufficient to invoke arranger status, even when the authority or obligation to control disposal is lacking.

In determining whether a potentially responsible party is an arranger under CERCLA, courts generally agree that there must be a nexus between the party's conduct and the disposal of the hazardous substance. *E.g., Geraghty & Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 929 (5th Cir.2000); *Gen. Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992). Courts discuss this nexus in varying terms, including authority, involvement, and obligation. In *AAMCO*, the Second Circuit noted that "[a]lmost all of the courts that have held defendants liable as arrangers have found that the defendant had some actual involvement in the decision to dispose of waste." 962 F.2d at 286; *see United States v. TIC Inv. Corp.*, 68 F.3d 1082, 1087–88 (8th Cir.1995) (requiring actual participation in, or exercise of control over, activities related to arrangement for disposal). The "ability or opportunity to control the disposal" is insufficient, *AAMCO*, 962 F.2d at 286, and absent actual involvement, the court continued, the nexus is found in the defendant's "obligation to arrange for or direct the[ ] disposal." *Id.* (quoting *CPC Int'l, Inc. v. Aerojet–General Corp.*, 759 F.Supp. 1269, 1278 (W.D.Mich.1991) ("The nexus issue is not a test of whether a party created or left hazardous substances or had title to them, but rather whether the party assumed responsibility for determining their fate.")).

In evaluating whether the requisite nexus exists, courts have employed a "totality of the circumstances" approach, applying guidelines established by the relevant case law to the facts presented in each individual case. *Geraghty & Miller*, 234 F.3d at 929; *S. Fla. Water Mgmt. Dist. v. Montal-*vo, 84 F.3d 402, 406–07 (11th Cir.1996); *United States v. Gordon Stafford, Inc.*, 952 F.Supp. 337, 340 (N.D.W.Va.1997). While ownership or possession of the hazardous waste is a factor, it is not a prerequisite for arranger status. *United States v. Union Corp.*, 259 F.Supp.2d 356, 393 (E.D.Pa. 2003) (citing *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373 (8th Cir. 1989)). Additional factors include "a party's knowledge (or lack thereof) of the disposal" and "whether a defendant made the 'crucial decision' to place hazardous substances in the hands of a particular facility." *Montalvo*, 84 F.3d at 407; *see also United States v. N. Landing Line Constr. Co.*, 3 F.Supp.2d 694, 701 (E.D.Va. 1998).

 We conclude that analyzing arranger status based on the totality of the circumstances under guidelines that the federal cases have established "is most faithful to the statutory language and purposes of [SWDA]." *Mathews v. Dow Chem. Co.*, 947 F.Supp. 1517, 1525 (D.Col.1996). The facts of each case must be examined to determine whether the requisite causal nexus exists between the defendant's conduct and the disposal of solid waste. In examining the facts, courts should take into consideration whether a defendant: owned or possessed the solid waste in question; had the authority to make disposal decisions; had the obligation to make disposal decisions; exercised control over decisions regarding the waste's disposal; or actually disposed of the solid waste. Any single factor may or may not be dispositive, depending upon the circumstances presented, but we decline to hold, as Street would have us do, that actual involvement in waste disposal is never sufficient without the authority to control the disposal. Such a holding would allow a party to escape arranger status simply by acting outside the scope of its authority,

which is surely contrary to the broad, remedial purpose SWDA was meant to serve. We recognize, though, the difficulty of uniformly applying a test based on nothing more than "the totality of the circumstances."

As guidance in a practical application of the test, we find helpful the "actual control" half of the line of cases discussing when and to what extent a general contractor owes a common law duty of care to a subcontractor's employees.[9] Such a duty can arise, for example, when the general contractor exercises actual control over the subcontractor's work such that the contractor is required to exercise that control with reasonable care. *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex.1999) (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985)). A contractor assumes such a duty through the actual exercise of control "over the manner in which the [sub]contractor's work was performed." *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex.2002). The subcontractor must be "controlled as to his methods of work, or as to operative detail." *Koch*, 11 S.W.3d at 155 (quoting Restatement (Second) of Torts § 414 cmt. c (1965)). Further, " 'the control must relate to the injury the negligence causes.' " *Bright*, 89 S.W.3d at 607 (quoting *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex.1999)). In *Bright*, an employee of subcontractor Gulf States, Inc., was injured when an overhead pipe that had been secured by another Gulf States employee fell on his arm. The Court held that Dow, the general contractor, did not exercise actual control over the details of the employee's work sufficient to create a duty, noting that the evidence showed Dow had not instructed the employee how to perform his job, nor was Dow involved in the decision as to how or when to secure the pipe that fell. *Id.; see Khan*, 138 S.W.3d at 294 (holding court's inquiry regarding control must focus on specific act that ultimately occurred).

■ Similarly in the context of arranger liability, we believe the courts' inquiry should focus on the degree of the defendant's actual control over the decision regarding the specific method or manner of disposal. This focus eases the determination of arranger status in difficult cases when the defendant did more than merely sell a product containing a solid waste, but stopped short of physically disposing of it. For example, in *AAMCO*, several oil companies leased service station facilities to individual dealers and sold petroleum products to some of the dealers, including underground tanks used for storing waste motor oil until it could be disposed. 962 F.2d at 283–84. The oil companies' representatives periodically inspected the equipment, but made no recommendations regarding disposal methods and did not participate in disposal decisions, which were left to the dealers' discretion. *Id.* at 284. The court held the oil companies were not arrangers because they exercised no control over disposal decisions, nor were they obligated by contract or otherwise to exercise that kind of control. *Id.* at 287–88.

9. A general contractor may also owe a duty of care under Texas law when it retains an explicit contractual right to control a subcontractor but does nothing. *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex.2004); *see Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469, 470 (Tex.1985) (per curiam). But SWDA's requirement that a responsible party must have "arranged to process, store, or dispose of ... solid waste" seems to suggest that something more than mere failure to intervene is required, at least when no contract obligates a defendant to make those arrangements. *See Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir.1993).

In these types of cases, the courts have considered the degree of actual control the defendants exercised, or were obligated to exercise, over the solid waste disposal decisions that were made. And while ownership, authority, and knowledge of disposal methods were factors those courts considered, none were determined to be dispositive. We believe that focusing on the degree of control an alleged arranger actually exercised over the method or manner of disposal provides some degree of uniformity under the law, while at the same time allowing courts to consider the totality of the circumstances presented in any given case so that needed flexibility is allowed in effectuating SWDA's broad remedial purpose. *Murtha*, 958 F.2d at 1198 (CERCLA interpreted liberally); *Burch*, 518 S.W.2d at 544 (remedial statutes construed liberally).

The court of appeals in this case held that Street, through Corbin, arranged for the disposal of solid waste in two ways. First, Corbin directly advised Pilgrim to dispose of PCE-contaminated separator water by dumping it into the public sewer. 81 S.W.3d at 295. Second, after performing titration tests to check detergent concentration in Pilgrim's cleaning machines, Corbin himself "thousands of times" disposed of a chemical mixture containing 1.25 cc's of PCE by pouring it down the sinks and toilets. *Id.* at 296. The court of appeals rejected, however, Pilgrim's argument that Street's role in Pilgrim's choice of waste disposal companies subjected Street to arranger liability. *Id.* at 294. Finally, the court held that Pilgrim did not have to show that Street's conduct caused Pilgrim to incur response costs in order to maintain its SWDA action, concluding that under SWDA the trial court takes "causa-

tion-like factors" into consideration when apportioning costs after a defendant is determined to be responsible under the Act. *Id.* at 298. We address these specific holdings in turn.[10]

### 1. Technical Services and Advice

■ Street contends it did not become an arranger by providing technical services and advice to Pilgrim, even when the advice related to waste disposal, because Street had neither the authority nor the obligation to control such disposal. Street also argues that subjecting chemical suppliers to arranger liability for providing technical services and advice, without the accompanying ability or authority to control whether that advice is followed, will have the deleterious effect of discouraging suppliers from disseminating safety-related information to its customers.

Pilgrim responds that Street did not merely sell products and equipment to Pilgrim and render occasional technical advice regarding their use; rather, Street regularly came into Pilgrim's facilities, gave direct instructions on how to dispose of waste containing PCE, and knew that Pilgrim relied upon and followed its instructions. Pilgrim argues that while Street, through Corbin, may have had no obligation to become involved in the disposal of waste generated through the use of its equipment, Street nevertheless chose to do so on a frequent and ongoing basis.

We have found no federal cases holding that a defendant's provision of technical services and advice rendered it an arranger under CERCLA, and there are few cases that even discuss the issue. But we find instructive two cases with facts similar to those before us. In *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685

10. Because Pilgrim does not dispute the court of appeals' holding that Street's role in Pilgrim's choice of waste disposal companies was not an independent basis for Street to qualify as an arranger, we need not address that specific holding.

F.Supp. 651 (N.D.Ill.1988), Hines owned and operated a wood treatment plant and purchased CCA, a chemical used in the treatment process, from Osmose Wood Preserving Company of America. Pursuant to an agreement, Osmose also designed, constructed, and installed a CCA treatment system, trained Hines personnel to run the system, and provided technical information and marketing assistance to Hines, while Hines maintained sole responsibility for the plant's operation, maintenance, and compliance with government regulations. Osmose also had a contractual right of full access to the plant for quality control purposes, though its employees did not visit the plant on a regular basis. Hines stored run-off from the treatment process, including CCA, in a holding pond at the site, and the chemicals were later identified as posing a potential environmental risk. The district court held, in relevant part, that Osmose was not liable as an arranger for any future liability Hines incurred as a result of the contamination. *Id.* at 654–56. The court determined that Osmose's mere knowledge of the manner in which Hines disposed of run-off containing the hazardous substances was irrelevant; rather, the crucial inquiry was " 'who decided' the location and method of disposal or treatment of the hazardous substance." *Id.* at 655. Because Osmose did not decide how the CCA would be disposed after its use in the wood treatment process, the court concluded, Osmose as a matter of law was not responsible as an arranger under CERCLA. *Id.* at 656.

*Jordan v. Southern Wood Piedmont Co.,* 805 F.Supp. 1575 (S.D.Ga.1992), *aff'd,* 861 F.2d 155 (7th Cir.1988), also involved a CERCLA-arranger claim against a supplier of chemicals used at a wood treatment plant. The plaintiffs relied on evidence that the supplier, Dow Chemical Company, provided a Material Safety Data Sheet ("MSDS") that described a disposal method for the chemical, provided various technical bulletins and communications inviting inquiries regarding chemical handling, and conducted tests and surveys at the site. The district court noted that the MSDS, which recommended incinerating the chemical if local regulations permitted and otherwise storing it in closed containers and contacting the supplier, was distributed in compliance with OSHA regulations and could not provide the basis for arranger liability. *Id.* at 1580. With regard to the bulletins and communications, the court held there was no evidence of instances where Dow actually gave advice concerning disposal and that the context of the statements showed "Dow sought to ensure that chemicals it manufactured were properly handled and not that it was attempting to arrange for or control their disposal." *Id.* Finally, the court held there was no evidence that the tests and surveys Dow performed at the site related to disposal. *Id.*

The facts in this case are similar to the situations presented in *Hines* and *Jordan* in a number of respects. Pilgrim does not dispute that it retained ultimate authority and responsibility for operating its facilities, which included disposing of PCE waste after it was recycled. And clearly it is not enough to establish arranger status that Street supplied the PCE and equipment to Pilgrim, maintained the equipment that it supplied, or knew how Pilgrim was disposing of the waste that was generated. Neither does "sending technical bulletins relating to waste disposal" qualify as arranging for disposal, as the court of appeals held. 81 S.W.3d at 295; *see Jordan,* 805 F.Supp. at 1580. The court of appeals, however, distinguished this case from *Jordan* because "Street actually gave direct advice to Pilgrim ... to dispose of PCE-containing separator water by dumping it

into the public sewer." [11] 81 S.W.3d at 295.

■ We agree with the court of appeals that this is a closer case than *Hines* and *Jordan* due to the extent of Corbin's involvement with Pilgrim over the years, the fact that he gave Pilgrim advice regarding a disposal method for the separator water, and the fact that Pilgrim followed his recommendations most of the time. But we think it significant that Street did not actually control the specific method and manner in which Pilgrim disposed of the separator water, instead simply responding, when asked, that Pilgrim could dispose of its separator water the "same way everybody else was doing it, pouring it down the drain." Although the presence of authority to make disposal decisions is not necessarily a prerequisite for arranger status, such as when a party physically disposes of solid waste with no authority to do so, it is a key factor when arranger status is based on mere advice regarding disposal that another party is free to ignore. Without such authority, we fail to see how Street could have "made the decision" to dispose of the separator water or exercised sufficient control over the disposal method such that the causal nexus between Street's conduct and the disposal of solid waste was established. Given the absence of any obligation with regard to waste disposal decisions, Street's lack of ownership of or authority over the chemicals that Pilgrim discarded, and the fact that Pilgrim never ceded ultimate control over

this aspect of its operations, we disagree with the court of appeals' conclusion that Corbin's advice rendered Street a "person responsible for solid waste" under SWDA.

Street and several *amici curiae*[12] raise valid concerns that imposing arranger liability on chemical manufacturers and suppliers for providing technical services and advice will have the adverse effect of discouraging these companies from providing valuable advice to customers regarding the safe use and handling of their products. In *Jordan*, the district court noted that, in addition to the fact that Dow never gave advice regarding disposal, the context of the technical bulletins and communications at issue "demonstrate[d] that in making them Dow sought to ensure that chemicals it manufactured were properly handled and not that it was attempting to arrange for or control their disposal." 805 F.Supp. at 1580. The court emphasized that imposing "liability upon a manufacturer on account of its dissemination of safety-related information is anathematic, even to the broad and salutary remedial purposes of CERCLA." *Id.* We agree. If a chemical manufacturer can subject itself to potential SWDA liability for disseminating safety information about its chemical products, which often includes their proper handling and disposal, they will likely be less inclined to provide this type of information at all.

### 2. Test–Vial Discharge and the Domestic Sewage Exclusion

11. The court of appeals rejected Pilgrim's contention that Corbin's advice to throw used filter cartridges and still residues in the dumpster subjected Street to arranger liability, holding that there was evidence Pilgrim engaged in this disposal method even before the advice was given and, in any event, there was a fact issue as to whether Corbin even gave such advice with regard to the still residues. 81 S.W.3d at 295 n. 16. Because Pil-

grim does not specifically challenge that aspect of the court of appeals' decision here, we do not consider it.

12. The chemical company *amici curiae* are Halogenated Solvents Industry Alliance, Inc., the American Chemistry Council, Inc., the Texas Chemical Council, Inc., and the Textile Care Allied Trades Alliance, Inc.

■ Street also contends the court of appeals erred in finding as a matter of law that Street, through Corbin, arranged for the disposal of solid waste by pouring the PCE mixture produced from the titration tests down the drain. Section 361.271 imposes liability on those who are responsible for "solid waste," and Street argues that it is not an arranger because the mixture Corbin disposed of does not constitute "solid waste" under the Act. SWDA defines "solid waste" in pertinent part as follows:

> (34) Subject to the limitations of 42 U.S.C. Section 6903(27) and 40 C.F.R. Section 261.4(a), 'solid waste' means garbage, rubbish, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations and from community and institutional activities. The term:
>
> (A) does not include:
>
> (i) solid or dissolved material in domestic sewage . . .; and
>
> . . . .
>
> (B) does include hazardous substances for the purposes of Sections 361.271 through 361.277, 361.280, and 361.343 through 361.345.

Tex. Health & Safety Code § 361.003(34).

The "limitations of 42 U.S.C. Section 6903(27) and 40 C.F.R. Section 261.4(a)," to which the definition refers, are known as the "domestic sewage exclusions." Section 6903(27), the "statutory domestic sewage exclusion," is a provision of RCRA which states that the term solid waste "does not include solid or dissolved material in domestic sewage." 42 U.S.C. § 6903(27). Section 261.4(a), the "regulatory domestic sewage exclusion," was implemented by the Environmental Protection Agency pursuant to its authority under RCRA and states that the term solid waste does not include "domestic sewage" or "[a]ny mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment." 40 C.F.R. § 261.4(a)(1) (2004). SWDA's exclusion, cited above, is similar. Tex. Health & Safety Code § 361.003(34)(A)(i) (the term solid waste "does not include . . . solid or dissolved material in domestic sewage").

Street contends that these RCRA statutory and regulatory exclusions apply to the test-vial mixture Corbin poured down the sinks and commodes at Pilgrim's facilities. In response, Pilgrim argues that the definition of "solid waste" is more restrictive for those portions of SWDA that impose detailed permitting, record keeping, and regulatory requirements, but more expansive for SWDA's provisions that deal with remediation and cost recovery. That is why, Pilgrim claims, the "solid waste" definition expressly provides that the term "does include hazardous substances for purposes of Sections 361.271 through 361.277, 361.280, and 361.343 through 361.345 [SWDA's remediation and cost-recovery provisions]." Tex. Health & Safety Code § 361.003(34)(B). Because SWDA, like CERCLA, defines a hazardous substance to include pollutants like PCE listed under 42 U.S.C. § 7412,[13] Pilgrim contends that PCE cannot be exempted from the definition of "solid waste" for cost-recovery purposes, notwithstanding the domestic sewage exclusion.

13. The EPA listed perchloroethylene as a hazardous air pollutant in an administrative rule enacted pursuant to section 7412. 40 C.F.R. § 61.01 (2004).

While SWDA's definition of "solid waste" is not a model of clarity and Pilgrim's argument has support in subsection (B)'s language, we disagree that the federal domestic sewage exclusions have no application here. The entire SWDA definition of "solid waste," including subsection (B) upon which Pilgrim relies, is expressly subject to the limitations of 42 U.S.C. § 6903(27) and 40 C.F.R. § 261.4(a), which contain the domestic sewage exclusions.

In so holding, we recognize that these exclusions do not similarly affect the definition of "hazardous substance" under CERCLA. As we have said, RCRA and CERCLA are complementary, but independent, environmental statutes. CERCLA was enacted after RCRA because the need to clean up hazardous waste sites was deemed impossible within the legal remedies then provided. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667 (5th Cir. 1989) (citing H.R.Rep. No. 1016, pt. 1, at 22 (1980)). RCRA regulates the disposal of solid wastes, 42 U.S.C. § 6903(27), and under RCRA, hazardous waste is a solid waste with certain properties. *Id.* § 6903(5). CERCLA, on the other hand, imposes liability on parties who have released hazardous substances into the environment. 42 U.S.C. § 9601(14). The Second Circuit has noted that "Congress and the EPA have carefully distinguished between *wastes,* to which the Resource and Recovery Act applies, and *substances,* to which CERCLA applies." *Murtha,* 958 F.2d at 1202 (emphasis in original). Courts are in agreement that exemptions under RCRA do not extend so far as to exclude those materials from the definition of hazardous substances under CERCLA. *See id.* at 1203 (citing *Eagle–Picher Indus., Inc. v. United States EPA,* 759 F.2d 922, 927 (D.C.Cir.1985), *Idaho v. Hanna Mining Co.,* 699 F.Supp. 827, 833 (D.Idaho 1987), *aff'd,* 882 F.2d 392 (9th Cir.1989), *United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143, 1147 (D.Ariz.1984), and *Transp. Leasing Co. v. California,* 32 E.R.C. 1499, 1501, 1990 WL 300777 (C.D.Cal.1990)).

In addition, the EPA has noted that compliance with the RCRA Subpart C regulations, which contain record-keeping, notification, and permit requirements, merely reduces the likelihood of liability arising under CERCLA. *Id.* at 1202 (citing EPA Directive No. 9574.00–1, Clarification of Issues Pertaining to Household Hazardous Waste Collection Programs, at 2 (Nov. 1, 1988)). Finally, the regulatory domestic sewage exclusion has limited applicability within RCRA itself. *See* 40 C.F.R. § 261.1(b)(1) (2004) ("The definition of solid waste contained in this Part applies only to wastes that also are hazardous for purposes of the regulations implementing Subtitle C of RCRA."); *id.* § 261.1(b)(2) ("This part identifies only some of the materials which are solid wastes and hazardous wastes under Sections 3007, 3013, and 7003 of RCRA."); *see also* Hazardous Substances: Notification of Treatment, Storage and Disposal Facilities, 46 Fed. Reg. 22,144, 22,145 (Apr. 15, 1981) (noting that the regulatory domestic sewage exclusion exempts "wastes [that] might otherwise be considered hazardous wastes").

Thus, CERCLA's definition of hazardous substances is not affected by either the statutory or regulatory sewage exclusion. However, we are bound by the plain language of section 361.003(34) of SWDA, in which the Legislature chose to limit the definition of solid waste by both 42 U.S.C. § 6903(27) and 40 C.F.R. § 261.4(a). Accordingly, if Corbin's disposal of the test-vial PCE mixture fits within RCRA's statutory or regulatory domestic sewage exclusions, we must give the exclusions effect.

Street contends that the PCE mixture Corbin poured down the facilities' sinks and commodes falls under either the statutory or regulatory domestic sewage exclusion. The rationale behind both exclusions "is that hazardous wastes discharged to POTWs [publicly owned treatment works] will be comprehensively regulated under the pretreatment provisions of the Clean Water Act, thus making RCRA regulation redundant." *People v. Sangani*, 22 Cal. App.4th 1120, 28 Cal.Rptr.2d 158, 163 (Ct. App.1994). As the scope of each exclusion is not identical, we examine each in turn.

The statutory exclusion, located in RCRA's definitional section, states that "[t]he term 'solid waste' means any garbage, refuse, sludge from a waste treatment plant ... *but does not include solid or dissolved material in domestic sewage* ...." 42 U.S.C. § 6903(27) (emphasis added). Street contends the court of appeals erroneously relied on *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Authority* ("*PRASA II* "), in which Street claims the First Circuit held only that waste disposed of in a solely industrial sewer line did not fall within the statutory domestic sewage exclusion because "domestic sewage" was limited to sewage that comes from residences. 888 F.2d 180, 184–86 (1st Cir.1989). Street claims the court of appeals ignored *PRASA II's* suggestion that the outcome might be different had the industrial sewer lines at issue later connected to lines that carried domestic waste. *Id.* at 187–88. Street argues that Pilgrim failed to establish that the sewer lines from each plant did not connect to lines carrying wastewater from residences and therefore waived the issue. Alternatively, Street asserts that there exists at least a fact issue regarding the exclusion's application.

We agree with the court of appeals that the reasoning in *Lincoln Prop-*

*erties, Ltd. v. Higgins*, CIV. No. S–91–760DFL/GGH, 1993 WL 217429 (E.D.Cal. Jan.21, 1993), upon which it relied, is persuasive; however, we also agree with Street that there is a fact issue in this case as to whether the exclusion applies. In *Lincoln Properties*, the court examined whether the exclusion precluded imposing RCRA liability for contamination under a dry-cleaning facility caused by leaking pipes. Concluding that the exclusion did not apply, the court stated, "*[T]he PCE at issue*—the PCE that leaked into the soil and groundwater—did not mix with the sewage from residential sources and was therefore *never* 'solid or dissolved material in domestic sewage.' " *Id.* at *11 (emphasis in original). Similarly, the contamination for which Pilgrim seeks contribution from Street is alleged to have occurred from leaks in sewage pipes on the property occupied by the dry-cleaning facilities. Thus, to the extent PCE leaked from those pipes, it never had the opportunity to mix with any potential domestic waste downstream, and the subsequent configuration of the pipes is irrelevant to our inquiry under 42 U.S.C. § 6903(27). But whether the sewage pipes leaked at Pilgrim's properties was a disputed issue at trial with conflicting expert testimony. Because there is a fact issue as to whether the pipes leaked, we cannot say as a matter of law that the statutory domestic sewage exclusion did not prevent the waste Corbin disposed of from qualifying as "solid waste."

For the same reason, although we do not agree entirely with Street's rationale, there is a fact issue as to whether the mixture Corbin disposed of falls within the regulatory domestic sewage exclusion, which is arguably broader than the statutory exclusion. The EPA promulgated this regulation pursuant to Subtitle C of RCRA. The regulation provides:

The following materials are not solid wastes for the purposes of this part:

(1) (i) Domestic sewage; and

(ii) Any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment. "Domestic sewage" means untreated sanitary wastes that pass through a sewer system.

40 C.F.R. § 261.4(a)(1) (2004).

Street cites the EPA order adopting the rule to support its contention that the exclusion exempts material from regulation the instant it enters a sewer system that will eventually mix with domestic sewage and regardless of whether the waste leaks from the sewer line before the mixture with domestic sewage occurs. *See* Hazardous Waste Management System: Identification and Listing of Hazardous Waste, 45 Fed.Reg. 33084, 33097 (May 19, 1980) (stating that "waste falls within the domestic sewage exemption *when it first enters a sewer system* that will mix it with sanitary wastes prior to storage or treatment by a POTW") (emphasis added); *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth.,* 693 F.Supp. 1324, 1331 (D.Puerto Rico 1988) ("*PRASA I*"), *vacated on other grounds,* 888 F.2d 180 (1st Cir.1989). However, further review of the relevant document reveals that Street has taken this statement out of context to support its argument. In this same publication, the EPA explains the above statement: "In light of the fact that the wastes will be mixed prior to treatment and that the mixture will be properly treated by the POTW, the EPA believes that the need for administrative clarity in this otherwise complicated regulatory program warrants such an approach." 45 Fed.Reg. at 33097.

The EPA's rationale for its conclusion would be defeated by Street's interpretation, as such waste would fall outside the ambit of both RCRA and the Clean Water Act. *See Lincoln Props.,* 1993 WL 217429, at *11 (citing 33 U.S.C. § 1317) ("The Clean Water Act ... establishes pretreatment standards for discharges into a 'publicly owned treatment works'; it does not apply to contaminants that are discharged into groundwater and never reach a 'treatment works.'"); *see also PRASA II,* 888 F.2d at 186 (deferring to the EPA's reading of the regulatory domestic sewage exclusion and holding that it does not apply to sanitary wastes originating at the workplace). The same reasoning renders immaterial Street's argument that a fact issue exists regarding whether the pipes at Pilgrim's facilities connected to residential lines. However, the fact issue regarding the sewage pipe leaks at Pilgrim's facilities is highly relevant and prohibits us from determining conclusively whether or not the regulatory exclusion applies.

Because there is conflicting testimony that raises a fact issue as to whether the sewage pipes leaked at Pilgrim's facilities, we cannot determine as a matter of law whether the PCE mixture Corbin poured down the drains at Pilgrim's facilities qualifies as solid waste subject to SWDA regulation, and thus whether Corbin's actions constitute an arrangement for the disposal of solid waste under the Act. The court of appeals therefore erred in holding that the exclusions do not apply, as Street is entitled to have fact questions resolved in the trial court.

### 3. Causation

Street contends that, even if its actions with regard to pouring PCE down the drain constitute an arrangement for disposal of solid waste, it still cannot be liable as an arranger because Pilgrim failed to prove that the contamination at its sites resulted from the PCE that Corbin poured into the sewer system. Specifically, Street references the conflicting evidence at trial

as to whether the contamination was caused by "minute amounts" of PCE that allegedly leaked from the pipes or by the spills of PCE that occurred at the facilities on a regular basis.

We have already held that the fact issue regarding the pipe leaks will have to be resolved on remand to determine the applicability of the domestic sewage exclusions. To aid the courts and the parties on remand, however, we note that the general question of causation in SWDA cases, while perhaps central to a determination of the amount of damages, if any, that should be awarded, is not relevant to the initial issue of whether a party is a "person responsible for solid waste" under SWDA. For a defendant to qualify as a potentially responsible party under CERCLA, the plaintiff need not show a direct causal link between the waste for which the defendant is responsible and the environmental harm at the site. *See, e.g., Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 655–56 (6th Cir.2000) ("It is clear from the text, structure and legislative history of [CERCLA] section 107 that the provision does not require a plaintiff to show that a particular defendant caused either the release or the incurrence of response costs in order to prove liability."); *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 603 (2d Cir.1999); *OHM Remediation Servs.*, 116 F.3d at 1578; *Alcan Aluminum Corp.*, 964 F.2d at 264–65; *United States v. Monsanto*, 858 F.2d 160, 169–70 (4th Cir.1988). An exception is found in the so-called "two-site" cases, in which hazardous substances are disposed of at one site and allegedly travel to a second site where there is a release. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999). In

such cases, courts have held that the plaintiff, as part of its *prima facie* case, must establish a causal connection between the defendant's disposal of hazardous substances and the response costs incurred in cleaning them up. *Id.*

■ As with CERCLA, there is no causation requirement in the language of SWDA with regard to maintaining a cost-recovery action or proving that a defendant is a "person responsible for solid waste." Tex. Health & Safety Code §§ 361.271, .344. Although Street refers to the PCE contained in the discarded test-vial mixture as "trace amounts," [14] the federal courts have uniformly held that there is no *de minimis* exception to responsible-person liability. *See, e.g., United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir.1993) ("The absence of . . . quantity requirements in CERCLA leads inevitably to the conclusion that Congress planned for the 'hazardous substance' definition to include even minimal amounts of pollution."); *Murtha*, 958 F.2d at 1200 ("[T]he concentration of hazardous substances in municipal solid waste—regardless of how low a percentage—is not relevant in deciding whether CERCLA liability is incurred."); *Alcan Aluminum Corp.*, 964 F.2d at 259–61 (holding there is no quantitative requirement on the term "hazardous substance" and rejecting the defendant's argument that it should not be held liable "because the level of hazardous substances in its emulsion was below that which naturally occurs"). This does not mean, though, that the quantity of waste a responsible party released is irrelevant in determining what, if anything, that party must pay in a cost-recovery action. Rather, the amount of waste released that is attributable to the defendant may be taken

---

**14.** Pilgrim, on the other hand, claims Street's "trace amounts" characterization ignores PCE's toxicity, arguing that "[e]ven just 1,000

cc's contaminates more than *50 million gallons* of ground water."

into consideration when the trial court is determining the *extent* of a defendant's liability by apportioning costs. Tex. Health & Safety Code § 361.343; *see also Menasha Corp.*, 228 F.3d at 656 (noting that "consideration of causation is proper only in allocating response costs, not in determining liability").

In explaining how courts should take causation into consideration in SWDA contribution actions, we find helpful the First Circuit's analysis in *Acushnet Co. v. Mohasco Corp.* 191 F.3d 69 (1st Cir.1999). There, the First Circuit reaffirmed the principle that, in a CERCLA action, there is no "minimal quantity" of waste required for a defendant to have caused the incurrence of response costs for liability purposes. *Id.* at 77. The court noted, however, that a district court could still be justified in allocating only a fraction or even none of the response costs to a *"de minimis* polluter," if such an equitable determination is supported by the record. *Id.* at 77–78. The court accordingly affirmed the district court's summary judgment in favor of one defendant and judgment as a matter of law in favor of three others, concluding that "the record was insufficient to permit a meaningful equitable allocation of remediation costs against any of these defendants under [CERCLA]." *Id.* at 72. The court based its holding not on a CERCLA causation requirement, but on CERCLA's "express authorization that a court take equity into account when fixing each defendant's fair share of response costs." *Id.* at 77–78 (citing 42 U.S.C. § 9613(f)).

■ SWDA, like CERCLA, contains an equitable component in fixing a responsible party's fair share of response costs. As discussed in more detail below, section 361.343 provides that apportionment shall be made according to various factors, including the relationship between the par-

ties' actions in disposing of solid waste, the volume of solid waste each party is responsible for at the site, and consideration of waste toxicity or other characteristics as they affect the cost to eliminate the release. Tex. Health & Safety Code § 361.343. These considerations, as in CERCLA cost-recovery actions, involve "quintessential issues of fact" that should be left to the sound discretion of the trial judge on remand. *Acushnet,* 191 F.3d at 79.

*4. Liability for Arranging to Process Solid Waste*

■ Pilgrim argues that, in addition to Street's liability for arranging to dispose of solid waste, Street is also "a person responsible for solid waste" because it "arranged to process" waste. Tex. Health & Safety Code § 361.271. The court of appeals did not address this argument, nor are there federal cases on point because arranger liability under CERCLA extends only to a person who arranged for disposal or treatment. 42 U.S.C. § 9607(a)(3). Pilgrim contends that Street arranged to process solid waste via Corbin's selection of the equipment Pilgrim used to recycle the PCE, along with his supervision and monitoring of the equipment. Pilgrim bases its argument on the definition of "processing" in SWDA as "the extraction of materials from or the transfer, volume reduction, conversion to energy, or other separation and preparation of solid waste for reuse or disposal." Tex. Health & Safety Code § 361.003(25).

We reject Pilgrim's argument. In order for the recycling process in question to constitute the "processing" of solid waste, the PCE being recycled must itself qualify as solid waste. It does not. SWDA subjects the definition of "solid waste" to the limitations of section 261.4(a) of the Code of Federal Regulations. *Id.* § 361.003(34). Section 261.4(a)(8) provides that "[s]econd-

ary materials that are reclaimed and returned to the original process or processes in which they were generated where they are reused" are not solid waste, provided the materials are contained in an enclosed system. 40 C.F.R. § 261.4(a)(8) (2004). When the Environmental Protection Agency adopted the rule, it stated that such a "closed-loop reclamation process" exclusion was necessary because the types of operations being excluded "are best viewed as part of the production process, not as a distinct waste management operation." Hazardous Waste Management System: Standards for Hazardous Waste Storage and Treatment Tank Systems, 51 Fed.Reg. 25422, 25442 (July 14, 1986). Significantly, the EPA specifically referenced "solvents returned for use as cleaning agents in dry cleaning operations," stating they "will be considered to be reused in the production process ... since they are used as the basic raw material in the process (in this case, cleaning)." *Id.* Finally, the EPA recognized that, while such materials would meet the exception, "wastes from their management are solid wastes. Thus, still bottoms from solvent reclamation in a closed-loop reclamation process remain solid wastes...." *Id.* at 25443.

The EPA rule and the order adopting it demonstrate the intent to exclude solvents that undergo a recycling process, like the one at issue in this case, from qualifying as "solid waste." The Legislature in turn adopted that rule as part of the SWDA definition of "solid waste." Tex. Health & Safety Code § 361.003(34). Thus, Street's actions in recommending and selling the PCE recycling equipment to Pilgrim cannot constitute an arrangement to process solid waste. However, the used cartridge filters, still bottoms, and separator water that contain PCE and are left over after these processes are not "reused in the production process" and are therefore not excluded under subsection (34) from the definition of solid waste. Our conclusion on this issue thus does not affect a party's potential liability with regard to disposal of such wastes.

## C. Remaining SWDA Liability Elements

The court of appeals held that Pilgrim proved the remaining elements of Street's SWDA liability as a matter of law. Specifically, the court of appeals held Pilgrim had conclusively established that the TNRCC approved Pilgrim's remedial action, the action was necessary to address a release or threatened release of solid waste, the costs of the action were reasonable and necessary, and Pilgrim made reasonable attempts to notify Street of the release and Pilgrim's intent to remedy it. 81 S.W.3d at 299–302. Street argues that there is a fact issue as to whether there was a release of solid waste and whether Pilgrim's remedial costs were reasonable and necessary. Of course, if there are disputed fact issues regarding these elements they must be submitted to the jury, as we have said. But because we are remanding Pilgrim's SWDA claim for a new trial, we need not decide whether these elements were conclusively established here.

## D. Apportionment of Damages

As we have discussed, SWDA sets forth equitable factors for the court to consider in deciding how to apportion costs for the elimination of a release of solid waste among those responsible under section 361.271:

(1) the relationship between the parties' actions in storing, processing and disposing of solid waste and the remedy required to eliminate the release or threatened release;

(2) the volume of solid waste each party is responsible for at the solid waste facility or site to the extent that the costs of the remedy are based on the volume of solid waste present;

(3) consideration of toxicity or other waste characteristics if those characteristics affect the cost to eliminate the release or threatened release; and

(4) a party's cooperation with state agencies, its cooperation or noncooperation with the pending efforts to eliminate the release or threatened release, or a party's actions concerning storing, processing, or disposing of solid waste, as well as the degree of care that the party exercised.

Tex. Health & Safety Code § 361.343(a). The court of appeals held that there were fact issues regarding the first two of the apportionment factors, specifically (1) "whether a causation-like relationship exists between" the actions that made Street a "person responsible for solid waste" and the required remedial activities at Pilgrim's facilities, and (2) the amount of waste attributable to Street. 81 S.W.3d at 305. The court held that these fact issues needed to be resolved by a jury before the trial court could equitably apportion damages. *Id.*

Street does not contest that the trial judge ultimately apportions costs in a SWDA cost-recovery action. Tex. Health & Safety Code § 361.344(d) (stating that the court determines the amount of cost recovery according to the criteria prescribed by section 361.343). Nor does Pilgrim dispute the court of appeals' recognition of underlying fact questions or complain of the court of appeals' judgment requiring a remand on the issue of damages. *See Burrow v. Arce,* 997 S.W.2d 229, 245 (Tex.1999) (fact issues underlying determination of equitable relief resolved by jury). If Pilgrim proves the underlying liability elements of SWDA on remand, the above fact issues will need to be resolved for the trial court to determine whether and how damages shall be apportioned.

## III. Disposition

Street argues that Pilgrim waived its right to recover under SWDA by failing to request jury questions concerning the factually disputed liability elements; thus, Street contends, Pilgrim is not entitled to a remand and judgment should be rendered in Street's favor. *See* Tex.R. Civ. P. 279 ("Upon appeal all independent grounds of recovery ... not conclusively established under the evidence and no element of which is submitted or requested are waived."). The court of appeals rejected Street's argument, holding that Pilgrim should not be penalized for relying on the trial court's ruling that Pilgrim's SWDA claim should be decided as a matter of law. 81 S.W.3d at 305–06 (citing *Clark v. Lone Star Life Ins. Co.,* 347 S.W.2d 290, 292 (Tex.Civ.App.-Waco 1961, writ ref'd n.r.e.) (holding that predecessor to Rule 279 did not apply when trial court granted directed verdict because in doing so the court withdrew case from jury)).

██ We note that, even if rendition would otherwise be appropriate under Rule 279, which we need not decide in this case, we nevertheless may remand in the interest of justice. Tex.R.App. P. 60.3; *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 840 (Tex.2000) (explaining that "we have remanded in the interest of justice when our decisions have altered or clarified the way in which a claim should be submitted to the jury"). We have found no other examples of a SWDA cause of action proceeding to a trial and final judgment, and the trial court had no guidance on submitting a SWDA claim to the jury.

The parties argued extensively at the charge conference over whether Pilgrim's SWDA claim should be decided as a matter of law or should be submitted to the jury. The trial court ultimately determined that it was a question of law and thus effectively withdrew the case from the jury. Because no appellate court had written about the proper submission of a SWDA claim when the case was tried, we decline to render judgment in favor of Street and hold that a remand in the interest of justice is appropriate.

Next, Street argues that, assuming remand is appropriate, both liability and damages under SWDA must be remanded for trial rather than damages alone, as the court of appeals held. Tex.R.App. P. 44.1(b) (prohibiting an appellate court from ordering a separate trial solely on unliquidated damages if liability is contested). We have already determined that there is a fact issue that must be resolved before the legal determination of Street's arranger status can be made. We therefore hold that the court of appeals erred in failing to remand the entire SWDA claim, both the liability elements and damages, for a new trial.

## IV. Conclusion

The court of appeals erred in holding that Corbin's advice to Pilgrim regarding disposal of separator water subjected Street to potential arranger liability and in holding as a matter of law that the domestic sewage exclusions did not apply to the PCE mixture Corbin poured down the drains. Because there were fact issues that needed to be resolved as to both liability and damages, the court of appeals erred in failing to remand the SWDA claim for a new trial. Accordingly, we reverse the court of appeals' judgment in part and remand to the trial court for further proceedings.

Justice JOHNSON did not participate in the decision.