**Opinion filed August 31, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00255-CV

_____

## WEATHERFORD INTERNATIONAL, LLC AND WEATHERFORD U.S., L.P., Appellants

## V.

## CITY OF MIDLAND, Appellee

**On Appeal from the 385th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV55471**

## O P I N I O N

This is an interlocutory appeal from the grant of a plea to the jurisdiction in favor of Appellee, the City of Midland (the City). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (West Supp. 2021). Appellants, Weatherford International, LLC and Weatherford U.S., L.P. (collectively, Weatherford) brought a cost-recovery

action under the Solid Waste Disposal Act (SWDA) against the City[1] for past and future response costs incurred to remediate the contamination of well water located on a property once owned by Weatherford. *See generally* TEX. HEALTH & SAFETY CODE ANN. §§ 361.271(a), .344 (West 2016). In its sole issue on appeal, Weatherford contends that the trial court erred when it granted the City's plea to the jurisdiction based on the City's defense of governmental immunity. We affirm.

## I. *Factual and Procedural Background*

Weatherford filed the underlying lawsuit on April 1, 2019, seeking contribution from the City under the SWDA. In response, the City answered and filed a plea to the jurisdiction. In its filings, the City asserted that (1) it had governmental immunity from suit; (2) Weatherford failed to allege any waiver of the City's immunity; (3) Weatherford failed to assert that the City is a transporter of hazardous waste; and (4) Weatherford lacked standing to assert the claims it had raised in its petition.

On June 16, 2020, following a stay,[2] the trial court signed a scheduling order, which contained an agreed-upon discovery deadline of May 25, 2021. On October 20, 2020, Weatherford filed its second amended petition, which is the operative pleading for purposes of our review.

### A. *Weatherford's Factual Allegations*

Approximately twenty-five years ago, Weatherford purchased a 20.7-acre tract (the Site) from Energy Industries, Inc. As part of a joint-venture agreement,

---

[1]In addition to the City of Midland, Weatherford's original petition named the following defendants: AB-Tex Beverage, LTD; Aegis Chemical Solutions, LLC; Aplex Industries, Inc.; Bell Petroleum Services, Inc.; Control Power, Inc.; CorCoat I, LLC; Core Laboratories, LP; Dawson Geophysical Company; Eco-Logical Environmental Services, Inc.; Exterran Energy Solutions, L.P.; Hy-Bon Engineering Company, Inc.; KES (USA) Inc.; Logicoat, Inc.; Luna Mesa Ventures, LLC; NCZ I, Inc.; Pentair, Inc.; Spectrum Brand Holdings, Inc.; and Strong Properties, LLC.

[2]The lawsuit was stayed in July of 2019, when Weatherford commenced voluntary bankruptcy proceedings. The trial court later lifted the stay and signed the scheduling order referenced above.

Weatherford performed an environmental assessment of the Site in November of 1998. The results of that assessment revealed that a water well located on the Site contained certain contaminants. Weatherford subsequently notified the Texas Natural Resource Conservation Commission (TNRCC)—the nominal predecessor to the Texas Commission on Environmental Quality (TCEQ)[3]—of their November 1998 water testing results.

Weatherford sold the Site in 2001. Despite the sale, Weatherford continued its investigation into the source and cause of the contamination: from 2001 through 2009, Weatherford installed on the Site numerous groundwater monitoring wells, which detected the presence of trichloroethylene (TCE) and perchloroethylene (Perc). It was determined, however, that the highest concentrations of TCE originated from an offsite location northeast of the Site.

In August of 2002, Weatherford submitted an Affected Property Assessment Report (APAR) to the TCEQ. The APAR revealed the existence of two contaminants—TCE and Perc—on the Site. Two years later, toward the end of 2004, the TCEQ conferred with Weatherford in regard to Weatherford's APAR and the contamination of onsite well water. At that time, the TCEQ contested Weatherford's representations in the APAR and required that Weatherford continue groundwater contamination delineation procedures offsite on water wells located within a half-mile radius of the Site. The TCEQ ultimately rejected Weatherford's APAR and assessment that it had delineated the affected groundwater.

In December of 2007, ownership of the Site again changed hands. However, following another TCEQ investigation in July of 2008, the TCEQ concluded that Weatherford was the party responsible for the subject contamination and required that Weatherford install at least one set of cluster wells.

---

[3]In 2004, the TNRCC became the TCEQ. Act of May 28, 2001, 77th Leg., R.S., ch. 965, § 18.01(a)(1), (b), 2001 Tex. Gen. Laws 1933, 1985.

Between 2009 and 2011, the TCEQ continued its investigation. The TCEQ also required that Weatherford continue investigating the potential offsite source of the contaminants; however, the TCEQ suggested that, if the source of the groundwater contamination on the Site was, in fact, offsite, Weatherford could consider applying for an "Innocent Owner/Operator (IOP) Certificate." Subsequently, a September 2013 groundwater assessment report, prepared by Weatherford's environmental consultant, ENVIRON, concluded that the contamination originated from an up-gradient source that was not connected to or associated with the Site. However, without denying the apparent existence of an offsite contaminator source, the TCEQ rejected Weatherford's denial of liability for the contamination the following month and requested that Weatherford submit another APAR.

As a result, ENVIRON continued its investigation. By February of 2015, ENVIRON had alerted the TCEQ that Hy-Bon, as successor-in-interest to EndDevices, was potentially responsible for the presence of TCE and any resulting contamination. According to Weatherford, Hy-Bon and EndDevices operated in close proximity to an upgradient monitoring well located northwest of the Site and, in prior decades, had utilized TCE and Freon 113 in its manufacture of electronic components.

Within days, Weatherford provided the TCEQ with ENVIRON's interim APAR, which "outlined the history and operations, previous investigations, offsite sources, geology, and hydrogeology" and "recommended the installation of [ten] additional [monitoring wells]." Although the TCEQ agreed that an offsite contributor was likely, it maintained its contention that "sufficient evidence demonstrated that Weatherford used TCE during its operations" and, thus, that Weatherford's operations were also a source and cause of the contamination. Weatherford disputed this contention.

4

In March of 2016, Weatherford submitted a final APAR and an interim Response Action Plan (RAP) to the TCEQ. In a response letter dated April 15, 2016, the TCEQ tentatively approved Weatherford's APAR, subject to Weatherford's responses to an enclosed list of comments and Weatherford's revision of a section of the APAR. In a subsequent response letter dated April 25, 2016, the TCEQ approved Weatherford's interim RAP.

Ramboll Energy (Ramboll)—successor to ENVIRON—prepared an "Off-Site Investigation Summary" dated August 11, 2016 (the Ramboll Report). The Ramboll Report provided that "the primary obstacle to completing Weatherford's investigation was the denial of access to a utility easement behind the EndDevices (and subsequently Hy-Bon) property to access [the City's] sewer system, which it believed was one of the sources of TCE contamination in the groundwater plume." Ramboll concluded that ENVIRON's 2013 investigation "revealed no evidence that Weatherford or its predecessors or successors" were responsible for the release of TCE or Perc on the Site. In addition to its initial Report, Ramboll prepared the final RAP, dated September 2, 2016. Ramboll's RAP proposed methods for remediating the contamination, and it concluded that "TCE leaking from the sanitary sewer line into adjacent soil was the source area of Perc in the groundwater."

In its pleadings, Weatherford alleged that it complied with the RAP, which in turn caused it to expend millions of dollars to investigate and respond to the conditions at the Site. With respect to the City, Weatherford alleged that:

> [The City] owned and operated the *sewer systems* running adjacent to the Site and the affected water wells. [The City] also permitted EndDevices and Hy-Bon to dispose of hazardous waste, including the Contaminants of Concern, through its *sewer system*. During Ramboll's investigation, it identified the *sewer system* as a likely source of contamination of the Site and affected water wells.

(Emphasis added). As such, Weatherford asserted a contribution claim against the City for the response costs it incurred under the SWDA.

B. *The City's Response*

In its plea to the jurisdiction, the City contended that Weatherford's factual allegations did not give rise to any liability on behalf of the City under the SWDA and that governmental immunity barred the claims that Weatherford had asserted against it. In support of its plea, the City filed, among other things, a declaration by Carl Craigo, the City's Director of Utilities. Craigo's declaration provided in part:

4. The City owns and operates a domestic wastewater treatment plant ("WWTP") . . . .

5. The City's domestic WWTP is subject to Texas Pollutant Discharge Elimination System Permit No. WQ0010223001 (the "Discharge Permit"), which regulates [its] treatment of raw domestic wastewater and subsequent discharge.

6. The City has not been required to maintain a TCEQ-approved Pretreatment Program historically, and prior to the current Discharge Permit, no reference to a TCEQ approved Pretreatment Program existed in [the City's] previous permits.

7. In the absence of a TCEQ-mandated Pretreatment Program, the City has historically maintained control over discharges to its wastewater collection system by issuing Discharge Licenses to industries that seek to discharge into the City's wastewater collection system. That process is robust and requires [the City's] approvals prior to any discharge into the City's wastewater collection system.

8. Upon a diligent search, the City has no Discharge License records for either Hy-Bon Engineering Company, Inc. or EndDevices at any point in history, including during the time frame . . . alleged by [Weatherford] in the current litigation against the City . . . .

9. As such, [the City] has never known of, nor has it ever identified Hy-Bon and EndDevices as entities contributing wastewater to [the City's] wastewater collection system.

10. [Weatherford] ha[s] never contacted [the City] to discuss the existence of any release from [the City's] wastewater collection system, nor to discuss any cost recovery for any alleged release of contaminants. The first occasion of [the City's] contact from [Weatherford] was their filing of the current litigation . . . .

6

The City also filed objections and a motion to strike Weatherford's responsive evidence to the City's plea, including the Ramboll Report.

We note that, in Weatherford's response to the City's plea, Weatherford alleged that Ramboll interviewed a former employee of EndDevices. This individual informed Ramboll that, during his employment with EndDevices, "it was common practice to dispose of TCE down the sink." This practice continued, according to the unnamed former employee, for over ten years—"with the written approval of [the City]." However, Weatherford further explained that, "Ramboll's efforts to locate and obtain the written approval from the City have not been successful."

C. *The Hearing*

On October 21, 2020, the day after Weatherford filed its second amended petition, the trial court held a hearing on the City's plea to the jurisdiction and motion to strike. After considering the evidence and arguments, in an order dated October 28, 2020, the trial court granted the City's plea to the jurisdiction and dismissed all claims that Weatherford had asserted against the City with prejudice. Additionally, the trial court sustained, in part, the City's objections and motion to strike portions of the Ramboll Report.

In its sole issue, Weatherford contends that, because the SWDA waives the City's governmental immunity, the trial court erred when it granted the City's plea and dismissed Weatherford's cost-recovery claims for lack of subject-matter jurisdiction. We disagree and affirm the trial court's order.

II. *Standard of Review*

Before a court may dispose of a case, it is essential that the court possess subject-matter jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000). Whether a trial court has subject-matter jurisdiction over a case is a question of law that we review de novo. *Harris Cnty. v. Annab*, 547 S.W.3d 609, 612 (Tex. 2018) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217,

7

226 (Tex. 2004)); *Ector Cnty. v. Breedlove*, 168 S.W.3d 864, 865 (Tex. App.—Eastland 2004, no pet.).

III. *Analysis*

A. *Governmental Immunity*

The term "sovereign immunity" applies to the State and the divisions of state government. *Goodson v. City of Abilene*, 295 S.W.3d 692, 694 (Tex. App.—Eastland 2009, no pet.). Although the terms "sovereign immunity" and "governmental immunity" are often used interchangeably, "governmental immunity" is the proper term to use when referring to political subdivisions of the State, such as cities, counties, and school districts. *Id.* Governmental immunity operates like sovereign immunity. Therefore, if the State retains sovereign immunity, its political subdivisions, such as the City in the case before us, also retains governmental immunity. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004).

Governmental immunity embraces two concepts: immunity from suit and immunity from liability. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006); *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). Courts do not possess subject-matter jurisdiction over a claim that is asserted against a governmental defendant that is immune from suit unless the State has expressly consented to suit. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003) ("Governmental immunity from suit defeats a [trial] court's subject matter jurisdiction." (citing *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999))); *Montgomery Cnty. v. Veterans Land Bd. of Tex.*, 342 S.W.3d 219, 221–22 (Tex. App.—Beaumont 2011, no pet.). On the other hand, immunity from liability is an affirmative defense, not a matter of subject-matter jurisdiction; however, this immunity must still be waived by the State. *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009); *Miranda*, 133 S.W.3d at 224. Because immunity from suit defeats a

8

trial court's subject-matter jurisdiction, it is properly raised in a plea to the jurisdiction. *Miranda*, 133 S.W.3d at 225–26.

A governmental entity, such as the City, retains its immunity unless the legislature clearly and unambiguously waives it. *Dohlen v. City of San Antonio*, 643 S.W.3d 387, 392 (Tex. 2022) (citing *Tooke*, 197 S.W.3d at 330). The party seeking relief against a governmental entity bears the burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). Further, "when the Legislature conditions an immunity waiver on the existence of a statutory violation, the elements of the violation are jurisdictional facts." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 784 (Tex. 2018).

B. *Plea to the Jurisdiction*

A plea to the jurisdiction is a dilatory plea and a proper method by which to challenge a trial court's subject-matter jurisdiction. *Blue*, 34 S.W.3d at 554. The purpose of a plea to the jurisdiction is to defeat a pleaded cause of action without reaching the merits. *Id.* A plea to the jurisdiction may challenge the pleadings, the existence of jurisdictional facts, or both. *Clark*, 544 S.W.3d at 770; *City of Merkel v. Copeland*, 561 S.W.3d 720, 723 (Tex. App.—Eastland 2018, pet. denied). When the plea challenges the existence of jurisdictional facts, as in the case before us, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim. *Clark*, 544 S.W.3d at 770–71 (citing *Blue*, 34 S.W.3d at 555). In such cases, the standard of review mirrors that of a traditional summary judgment. *Id.* at 771 (citing *Miranda*, 133 S.W.3d at 225–26).

If the plaintiff's factual allegations are challenged with supporting evidence necessary to the consideration of the plea to the jurisdiction, the plaintiff must raise at least a genuine issue of material fact to overcome the challenge to the trial

court's subject-matter jurisdiction and avoid dismissal. *Id.* (citing *Miranda*, 133 S.W.3d at 221). When we determine whether a material fact issue exists, "we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor." *Id.* We cannot, however, disregard evidence that is necessary to show context; nor can we disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 811–12, 822–23, 827 (Tex. 2005)).

Here, Weatherford asserts that the SWDA waives the City's immunity from suit and, thus, that the trial court erred when it granted the City's plea to the jurisdiction. The City maintains that Weatherford failed (1) to identify any act committed by the City that would implicate the SWDA's waiver of the City's governmental immunity and (2) to raise a genuine issue of material fact to overcome the City's challenge to the trial court's subject-matter jurisdiction. For the reasons discussed below, we agree with the City that Weatherford's cost-recovery action is barred because Weatherford failed to raise a genuine issue of material fact as to whether the SWDA's waiver of immunity applies to any alleged act by the City.

C. *The SWDA*

Codified in the Texas Health and Safety Code, the SWDA's express purpose is "to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of *solid waste*, including accounting for hazardous waste that is generated." HEALTH & SAFETY § 361.002(a) (emphasis added). As such, the SWDA provides mechanisms for the "clean-up" of solid waste and authorizes a "person" to recover the costs of remediation from other "persons"—including a "governmental subdivision"—who are responsible for the waste. *R.R. St. & Co. v. Pilgrim Enters., Inc.*, 166 S.W.3d 232, 238 (Tex. 2005); *see* HEALTH & SAFETY § 361.003(23) (West Supp. 2021) (defining "person" under the SWDA); *see also* HEALTH & SAFETY §§ 361.272, .197, .344.

10

To establish a viable cost-recovery claim under the SWDA, a plaintiff must prove:

(1) the defendant is a "person responsible for solid waste" as defined in [S]ection 361.271;[4]

(2) the [TCEQ] approved the plaintiff's removal or remedial action;

(3) the action was necessary to address a release or threatened release of solid waste;

(4) the costs of the action were reasonable and necessary; and

(5) the plaintiff made reasonable attempts to notify the defendant of both the release and the plaintiff's intent to take steps to eliminate the release.

*R.R. St. & Co.*, 166 S.W.3d at 240 (citing HEALTH & SAFETY § 361.344); *e.g.*, *Montfort Square Shopping Ctr., Ltd. v. Goodyear Tire & Rubber Co.*, No. 3:10-CV-1673-D, 2012 WL 2358163, at *8 (N.D. Tex. June 21, 2012); *Aviall Servs. Inc. v. Cooper Indus., LLC*, 694 F. Supp. 2d 567, 574 (N.D. Tex. 2010). In this case, the parties dispute concerns the first element: whether the City is a person responsible for *solid waste* under the SWDA.[5]

The SWDA prescribes four categories of "persons responsible for solid waste." *See* HEALTH & SAFETY § 361.271(a)(1)–(4). As relevant here, a "person"— i.e., "an individual, corporation, organization, government or *governmental subdivision* or agency, business trust, partnership, association, or any other legal entity"—is responsible for solid waste if the person:

(1) is any owner or operator of a solid waste facility; [or]

. . . .

(3) by contract, agreement, or otherwise, arranged to process, store, or

---

[4]*See* HEALTH & SAFETY § 361.271.

[5]We note that, although Weatherford has requested that we take judicial notice of the City's status as a municipality, the City does not dispute that it falls within the SWDA's definition of "person" as a governmental subdivision.

dispose of, or arranged with a transporter for transport to process, store, or dispose of, solid waste owned or possessed by the person, by any other person or entity at: (A) the solid waste facility owned or operated by another person or entity that contains the solid waste; or (B) the site to which the solid waste was transported that contains the solid waste . . . .

*Id.* §§ 361.003(23) (emphasis added), .271(a)(1), (a)(3)(A)–(B). "Solid waste facility" means:

all contiguous land, including structures, appurtenances, and other improvements on the land, used for processing, storing, or disposing of solid waste. The term includes a publicly or privately owned solid waste facility consisting of several processing, storage, or disposal operational units such as one or more landfills, surface impoundments, or a combination of units. The term does not include a pyrolysis or gasification facility.

*Id.* § 361.003(36). For purposes of the SWDA, "solid waste" means:

garbage, rubbish, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations and from community and institutional activities. The term: (A) *does not include:* (i) solid or dissolved material in *domestic sewage* . . . .

*Id.* § 361.003(35)(A)(i) (emphasis added). The SWDA, therefore, waives immunity if a governmental subdivision, such as the City, is responsible for solid waste. *R.R. St. & Co.*, 166 S.W.3d at 240 (holding that satisfaction of Section 361.271(a) is the first element of an SWDA cost-recovery claim); *see* HEALTH & SAFETY §§ 361.003(23), .271(a). Because a statutory violation is necessary to establish an immunity waiver under the SWDA, "jurisdiction and the merits intertwine." *Clark*, 544 S.W.3d at 783; *e.g.*, *Zumwalt v. City of San Antonio*, No. 03-11-00301-CV, 2012 WL 1810962, at *3 (Tex. App.—Austin May 17, 2012, no pet.) (mem. op.).

In this case, Weatherford asserts that the City is "a [governmental subdivision] responsible for solid waste" under either of the following two scenarios: (1) as an

12

owner or an operator of a solid waste facility, or (2) as an arranger of the disposal of solid waste at a solid waste facility. *See* HEALTH & SAFETY § 361.271(a)(1), (a)(3); *see also id.* § 361.003(23). Therefore, taking as true all evidence that is favorable to Weatherford, we must determine if a material fact issue exists as to whether, under the SWDA, the City is either (1) an "owner" or "operator" of a solid waste facility or (2) an "arranger" of the disposal of solid waste at a solid waste facility.

When we construe a statute, our primary objective is to give effect to the legislature's intent. *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017); *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631–32 (Tex. 2008). Given the SWDA's remedial purpose, we construe the relevant statutory language liberally to give effect to that purpose. *R.R. St. & Co.*, 166 S.W.3d at 238.

As we have discussed, the City contends that it retains its governmental immunity from suit under the SWDA *unless* it is determined to be responsible for solid waste. Clearly, Section 361.271(a)(1) conditions a person's responsibility for solid waste on the person's status as "any owner or operator of a solid waste facility." HEALTH & SAFETY § 361.271(a)(1). However, and importantly, the record before us shows that Weatherford's allegations against the City, as raised in Weatherford's pleadings, are premised on the City's operation of a *domestic sewer system*—not the City's disposal of solid waste. In its second amended petition, Weatherford specifically refers to and identifies the City's *sewer systems* in connection with the allegations that it claims establish the City's liability. The City, in support of its plea, explained that its "WWTP system collects *domestic sewage* for conveyance and subsequent treatment" (emphasis added). Therefore, we hold that, pursuant to the statute's unambiguous terms, the SWDA's cost-recovery provision does not apply to the allegations and subject matter—i.e., a domestic wastewater collection system— that form the factual basis of the claims that Weatherford has asserted against the

City in this case. *See id.* § 361.003(35)(A)(i) ("'Solid waste' . . . does not include . . . solid or dissolved material in domestic sewage.").

Further, the City negated Weatherford's factual allegations that the City authorized EndDevices and Hy-Bon to dispose of waste into the City's domestic wastewater sewer system. Because Weatherford failed to raise at least a genuine issue of material fact to overcome the City's jurisdictional challenge, we agree with the City that neither its actions nor the allegations in Weatherford's pleadings subject the City to the provisions of the SWDA upon which Weatherford relies. Therefore, Weatherford failed to establish a waiver of the City's immunity under the statute.

Because the statutory definitions of "solid waste facility" and "solid waste" are fatal to Weatherford's cost-recovery claim against the City, we hold that the governmental immunity waiver provisions contained in the SWDA do not apply to the City in this case—regardless of whether the City is characterized as either (1) an "owner" or "operator" of a "solid waste facility" or (2) an "arranger" of "solid waste." Accordingly, we overrule Weatherford's sole issue on appeal.

## IV. *This Court's Ruling*

We affirm the order of the trial court.


W. STACY TROTTER

JUSTICE

August 31, 2022

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

14